# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BOBBY SARNEVESHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2025-0979-LWW |
| | ) | |
| TRILLER GROUP INC., f/k/a AGBA | ) | |
| GROUP HOLDING LIMITED, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: May 26, 2026
Date Decided: July 17, 2026

Richard P. Rollo, Travis Hunter, Danielle I. Bell, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Plaintiff*

**WILL, Vice Chancellor**

This action arises from breaches of a merger agreement. After the merger closed, the surviving entity failed to secure a promised $500 million equity investment and to register millions of shares issued to former noteholders. The stockholders' representative sued the surviving entity, which failed to appear. I entered a default judgment on liability against the entity and directed the plaintiff to prove damages at an evidentiary hearing. This post-hearing decision quantifies that award.

## I. BACKGROUND

The following facts are drawn from the well-pleaded allegations of the Verified Complaint (the "Complaint"), which are deemed admitted due to the defendant's default, as well as the expert testimony and evidence on damages.[1]

### A. The Merger

In early 2024, Triller Corp.—an artificial intelligence-driven social media platform—began exploring transaction opportunities.[2] Its efforts culminated in an

---

[1] Verified Compl. (Dkt. 1) ("Compl."); *see Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint."), *aff'd*, 58 A.3d 414 (Del. 2013); *Hauspie v. Stonington P'rs, Inc.*, 945 A.2d 584, 586 (Del. 2008) (explaining that on a default judgment, well-pleaded allegations are deemed admitted); Tr. of May 11, 2026 Evidentiary Hr'g on Damages (Dkt. 24) ("Evidentiary Hr'g Tr.").

[2] Compl. ¶¶ 8-9.

Amended and Restated Agreement and Plan of Merger (the "Merger Agreement").[3] The Merger Agreement was executed on August 29, 2024, by and among AGBA Group Holding Limited, AGBA Social Inc., Triller Corp., and plaintiff Bobby Sarnevesht as Holder Representative for the stockholders of Triller Corp.[4] The merger closed in October 2024.[5] AGBA Group Holding Limited changed its name to Triller Group Inc.—a Delaware corporation operating as a holding company and the defendant here.[6]

The Merger Agreement contained covenants to capitalize the post-merger entity and provide liquidity to certain investors. Two provisions are relevant to this lawsuit.

The first provision concerns stock issued to former holders of Corporation Convertible Notes ("CCNs") that Triller Corp. issued before the merger.[7] Under the Merger Agreement, these CCNs converted into shares of Triller Group common stock.[8] Section 4.12 of the Merger Agreement required Triller Group to "[p]romptly after Closing[] . . . prepare and file with the [Securities and Exchange Commission

---

[3] *Id.* at Ex. A ("Merger Agreement").

[4] *Id.* at 1.

[5] Compl. ¶ 10.

[6] *Id.* ¶ 4.

[7] *Id.* ¶ 12.

[8] Merger Agreement § 1.11.

2

(the "SEC")], a Registration Statement on an appropriate form, covering the resale" of the converted shares.[9] Triller Group agreed to "use commercially reasonable efforts to cause such Registration Statement to be declared effective under the Securities Act [of 1933] as promptly as possible."[10] These promises in Section 4.12 are referred to as the "Registration Covenant."

The second provision concerns capital raising for the newly merged enterprise. In Section 4.5 of the Merger Agreement, Triller Group "agreed . . . to use its best efforts to invest or arrange for an investment in the form of equity in the amount of $500 million into [Triller Group], post-Merger."[11] This provision is referred to as the "Investment Covenant."

## B. Post-Closing Financial Distress

After the merger closed, Triller Group failed to file a registration statement for the 54,077,698 shares held by the former CCN holders, preventing the resale of those shares on the public market.[12] Triller Group also took no steps to secure the $500 million equity investment.[13]

---

[9] *Id.* § 4.12; *see* Compl. ¶ 2.

[10] Merger Agreement § 4.12.

[11] *Id.* § 4.5.

[12] Compl. ¶¶ 14, 19-22.

[13] *Id.* ¶¶ 23-24.

Triller Group soon experienced significant financial and operational difficulties. On November 26, 2024, one of Triller Group's primary creditors, YA II PN, LTD ("Yorkville"), served to collect on a $35.4 million loan.[14] Triller Group defaulted, resulting in the loss of its majority stake in the Bare Knuckle Fighting Championship (BKFC)—Triller Group's primary asset.[15] Triller Group later defaulted on additional obligations, its sports streaming revenues ceased, and its main social media app became non-functional.[16]

Amid this distress, Triller Group failed to timely file its 2024 annual Form 10-K and 2025 quarterly Form 10-Q reports with the SEC.[17] Consequently, it received multiple delinquency and delisting notices from Nasdaq, and the trading of its stock was suspended for three and a half months.[18] By the spring of 2026, Triller Group's stock was trading at approximately $0.15 to $0.25 per share.[19]

---

[14] *See* Evidentiary Hr'g Tr. 20-21; Ex. to Letter Regarding Presentation of Pl.'s Expert (Dkt. 20) ("Expert Presentation") 11.

[15] *See* Evidentiary Hr'g Tr. 20-21; Expert Presentation 11.

[16] *See* Evidentiary Hr'g Tr. 42-43; Expert Presentation 25-26.

[17] *See* Evidentiary Hr'g Tr. 22; Expert Presentation 12.

[18] *See* Evidentiary Hr'g Tr. 22-23; Expert Presentation 12.

[19] *See* Evidentiary Hr'g Tr. 46; Expert Presentation 26.

## C.     This Litigation

On August 27, 2025, Sarnevesht sued Triller Group for breaching the Registration and Investment Covenants in the Merger Agreement.[20]  Service of process was executed on Triller Group's registered agent on September 3, 2025.[21] Triller Group never answered the complaint or otherwise appeared in this action.

On October 9, 2025, Sarnevesht moved for a default judgment.[22]  I set a February 6, 2026 hearing on the motion.[23]  Despite having notice of the hearing— and notice of this action as evidenced by a reference to the litigation in Triller Group's Form 10-K shortly before the hearing—Triller Group failed to appear.[24]  I granted the motion and entered a default judgment against Triller Group for breaching the Merger Agreement.[25]

---

[20] *See* Compl. ¶¶ 25-28.

[21] *See* Dkt. 3.

[22] Pl.'s Mot. for Default J. (Dkt. 6).

[23] Order Scheduling Hr'g on Mot. for Default J. Against Def. (Dkt. 8).

[24] *See* Letter Providing Additional Information in Advance of Hr'g on Mot. for Default J. (Dkt. 11) Ex. B at 93, 95.

[25] Order Granting Pl.'s Mot. for Default J. (Dkt. 14); *see* Tr. of Feb. 6, 2026 Telephonic Oral Arg. and Ruling of the Ct. on Pl.'s Mot. for Default J. (Dkt. 17) ("Default J. Hr'g Tr.") 13-14.

As a remedy, Sarnevesht requested between $256.8 and $458.7 million in damages for the Registration Covenant breach.[26] I ordered additional briefing on "the appropriate quantum of damages and the method of calculating damages."[27]

On February 10, Sarnevesht's counsel filed a letter stating that he was "willing to accept a reduced judgment now if that approach avoid[ed] the delay associated with an evidentiary damages hearing."[28] Relying on the "New York Rule," he argued that damages for the Registration Covenant breach should be calculated by treating the unregistered shares as either valueless or worth $0.15 per share, and multiplying the block of over 54 million shares by the stock's highest post-merger intermediate price of $4.75 per share.[29] This approach lowered his requested damages to a range of $248.76 to $256.87 million.[30] He reserved the right to pursue damages for the Investment Covenant breach if I "conclude[d] that an evidentiary hearing [were] necessary."[31]

---

[26] Default J. Hr'g Tr. 8-9.

[27] *Id.* at 14-15.

[28] Pl.'s Feb. 10, 2026 Letter Regarding Calculation of Damages (Dkt. 13) ("Pl.'s Pre-Hr'g Damages Letter") 1.

[29] *Id.* at 4-5.

[30] *Id.*

[31] *Id.* at 5.

In a March 27, 2026 letter opinion, I declined to award these damages on a paper record.[32] I also noted the improbability of liquidating tens of millions of shares at the peak price without depressing the market.[33] I further questioned the evidentiary basis for Sarnevesht's assertion that the shares were either valueless or worth $0.15 per share.[34] I directed Sarnevesht to provide expert analysis on the realistic timeframe for selling the shares and evidence of the shares' residual value.[35]

An evidentiary hearing on damages was held on May 11, 2026.[36] Triller Group again failed to appear. Sarnevesht presented expert testimony from A. Vincent Biemans, a managing director at Berkeley Research Group.[37] Biemans introduced a revised damages range of $285.0 million to $379.6 million for both the Investment Covenant and Registration Covenant breaches.[38] He attempted to quantify damages for the Investment Covenant breach by assigning a "but-for" open-market value to the stock.[39] To address my questions about market absorption,

---

[32] Letter Order Regarding Damages Request 1.

[33] *Id.* at 3-4.

[34] *Id.* at 4-5.

[35] *Id.* at 5.

[36] Dkt. 23.

[37] Evidentiary Hr'g Tr. 4.

[38] *Id.* at 5.

[39] *Id.* at 25-29.

Biemans also presented "dribble-out" and Black-Scholes put option analyses as proxies to calculate a "blockage discount"[40]

On May 26, Sarnevesht submitted a post-hearing brief maintaining his request for $285.0 million to $379.6 million of damages.[41] He continued to assert that the New York Rule supplies the proper measure of damages for the Registration Covenant breach and argued that expectation damages are warranted for the Investment Covenant breach.[42] He also requested pre- and post-judgment interest totaling between approximately $14.9 million and $56.8 million, depending on the principal amount awarded.[43]

## II.  ANALYSIS

When a defendant fails to answer or defend an action, the court may hold the defendant in default and enter a default judgment.[44] "The effect of a default in answering . . . is to deem admitted all the well-pleaded facts in the complaint."[45] But a default is not "treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover."[46]

---

[40] *Id.* at 34-41.

[41] Post-Hr'g Submission in Supp. of Damages (Dkt. 25) ("Pl.'s Post-Hr'g Br.").

[42] *Id.* at 4-8.

[43] *Id.* at 13; *id.* at Ex. A.

[44] Ct. Ch. R. 55(a), (b)(1).

[45] *Hauspie*, 945 A.2d at 586.

[46] *Id.* at 587 (citation omitted).

The court may "conduct hearings" or "receive evidence" when it "needs to . . . determine the amount of damages" to "effectuate default judgment."[47] "Typically, the sole focus of inquisition hearings is the amount of damages owed to the plaintiff, which is determined by the trial court judge."[48]

After a default judgment on liability, the plaintiff retains the burden of proving its damages by a preponderance of the evidence.[49] To do so, the plaintiff must demonstrate the extent of its damages with "reasonable certainty."[50] Although mathematical precision is not required once the fact of injury is established, the court will not "award damages based on 'speculation or conjecture.'"[51]

Contract damages are designed to fulfill "the reasonable expectations of the parties *ex ante*."[52] Damages must not serve as a "windfall."[53] Any damages awarded

---

[47] Ct. Ch. R. 55(b)(4)(B).

[48] *Tack v. Lipetz*, 2021 WL 4595660, at *3 (Del. Ch. Oct. 6, 2021) (citation omitted).

[49] *See id.*; *Winklevoss Cap. Fund, LLC v. Shaw*, 2024 WL 3888757, at *9 (Del. Ch. Aug. 21, 2024).

[50] *SIGA Techs., Inc. v. PharmAthene, Inc.,* 67 A.3d 330, 351 n.99 (Del. 2013) (citation omitted); Restatement (Second) of Contracts § 352 (Am. L. Inst. 1981) ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.").

[51] *NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *24 (Del. Ch. Aug. 2, 2023) (quoting *Acierno v. Goldstein*, 2005 WL 3111993, at *6 (Del. Ch. Nov. 16, 2005)); *see Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

[52] *Siga Techs., Inc. v. PharmAthene, Inc.* (*SIGA II*), 132 A.3d 1108, 1130 (Del. 2015) (quoting *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001)).

[53] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (citation omitted).

9

must have been proximately caused by the breach, limited to those "resulting from the direct and natural consequences" of the defendant's wrongful conduct.[54]

Here, Sarnevesht seeks damages for breaches of the Investment and Registration Covenants. As the Holder Representative designated to act as the agent for Triller Corp.'s former stockholders and a party to the Merger Agreement, he has standing to pursue damages on the stockholders' behalf.[55]

This decision resolves Sarnevesht's entitlement to recover damages for both the Investment Covenant and Registration Covenant breaches. I first assess damages for the breach of the Investment Covenant and conclude that the remedy sought is inappropriate. I then address damages for the breach of the Registration Covenant. I reject Sarnevesht's measures in favor of a volume-limited application of the highest intermediate price, which yields damages of $25,701,066.00. Finally, I award statutory pre- and post-judgment interest on the principal damages.

## A.    The Investment Covenant Breach

Triller Group breached the Investment Covenant.[56] Section 4.5 of the Merger Agreement states:

---

[54] *LCT Cap., LLC v. NGL Energy P'rs LP*, 249 A.3d 77, 91 (Del. 2021) (citation omitted).

[55] *See* Compl. ¶¶ 1, 3; Merger Agreement § 7.1(b); *see also NAF Hldgs., LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 179 (Del. 2015) (holding that commercial contract counterparties can sue directly for breach).

[56] Compl. ¶¶ 23-24; Default J. Hr'g Tr. 6, 14.

10

Parent has agreed (on its behalf and, as of the Domestication, on behalf of Delaware Parent) to use its best efforts to invest or arrange for an investment in the form of equity in the amount of $500 million into Delaware Parent, post-Merger, on terms and conditions to be agreed pursuant to long form definitive agreements.[57]

"Parent" (AGBA Group Holding Limited) became "Delaware Parent" during the "Domestication" from a British Virgin Islands company into a Delaware corporation, which occurred before the merger became effective.[58] Upon doing so, it changed its name to Triller Group.[59] Thus, Parent promised in the Investment Covenant to raise $500 million and put it into Delaware Parent—i.e., itself, rebranded as Triller Group. Accepting as true the well-pleaded allegations in the Complaint, Triller Group failed to secure the required $500 million equity investment.[60]

To remedy this breach, Sarnevesht seeks between $285.0 million and $379.6 million in expectation damages for the stockholders he represents.[61] Biemans arrived at this range by first calculating the gross "but-for" value of the former Triller Corp. stockholders' shares had the $500 million capital infusion been successfully

---

[57] Merger Agreement § 4.5.

[58] *See id.* at Recitals; *id.* § 1.1(a), (b).

[59] *See id.* at Recitals (stating that the post-domestication name change would be to "Triller Inc. or some variation thereof that includes the 'Triller' name"); Compl. ¶ 11; *id.* at 1 n.1.

[60] Compl. ¶ 24.

[61] Evidentiary Hr'g Tr. 5; Pl.'s Post-Hr'g Br. 1.

arranged, which he estimated fell between $303.6 million and $379.6 million.[62]  He then deducted the current residual value of the stock ($23.5 million, discounted by 20% for illiquidity) from the low end of this range to reach his final damages calculation.[63]

I reject this approach for three reasons.

First, Sarnevesht's damages model is disconnected from the theory of liability.  Expectation damages are meant to place the aggrieved party in the position it would have occupied had the contract been performed.[64]  Yet Sarnevesht seeks to place stockholders in a position superior to the one performance would have provided.[65]

---

[62] Expert Presentation 17; *see* Evidentiary Hr'g Tr. 5, 26-31; *infra* notes 68-69 (explaining Biemans's calculation).

[63] Expert Presentation 27; *see* Evidentiary Hr'g Tr. 46-48.  Biemans presented this range as his total combined damages for both the Investment and Registration Covenant breaches. He testified that the separate Registration Breach damages fell within this broader range. *See id.* at 14-15; Pl.'s Post-Hr'g Br. 12.

[64] *See* Restatement (Second) of Contracts § 347 cmt. a (Am. L. Inst. 1981) ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will . . . put him in as good a position as he would have been in had the contract been performed."); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1076 (Del. 1983).

[65] *See Paul*, 974 A.2d at 146 (observing that contract damages "are designed to place the injured party . . . in the same place as he would have been if the contract been performed" and that such damages "should not act as a windfall" (citation omitted)).

The Investment Covenant required Triller Group to secure $500 million for its corporate treasury.[66] There is no evidence that stockholders would have received a cash payout if Triller Group fulfilled this covenant. Instead, it seems more likely that Triller Group would have used the capital to pay creditors (such as Yorkville) and fund operations.[67]

Second, Biemans's methodology ignores the economic reality of the Investment Covenant. To calculate the gross "but-for" value of the shares, Biemans relied on historical, pre-distress data points—the $3.19 to $3.98 implied conversion price of the CCNs and the $3.47 initial volume weighted average price (VWAP) from the unaffected post-merger trading window—as proxies for what Triller Group's stock would have been worth had the $500 million been secured.[68] He then multiplied these "healthy" per-share values by the former Triller Corp. stockholders' original, undiluted share count.[69]

---

[66] *See* Merger Agreement § 4.5.

[67] *See* Evidentiary Hr'g Tr. 42-44; *see also* Expert Presentation 25-26.

[68] *See* Evidentiary Hr'g Tr. 26-31. Biemans's reliance on these proxies is also methodologically flawed. Regarding the implied conversion price, the 20% contractual discount granted to early debt investors reveals nothing about the actual economic value of the post-merger company's shares. *See id.* at 26-29 (responding to the court's questions and acknowledging the discount was a feature of the pre-merger notes). As for the post-merger VWAP, I address the flaws in my analysis of the Registration Covenant breach. *See infra* Section II.B.1.b.

[69] *See* Expert Presentation 17.

But the Investment Covenant explicitly required the $500 million to be raised "in the form of equity."[70]  If Triller Group had raised a $500 million equity investment, then the distressed holding company—whose stock was trading at roughly $0.15 to $0.25 per share—would have issued an enormous number of new shares to the new investors.[71]  This issuance would have substantially diluted the ownership interests of existing stockholders.  Because Biemans ignores this dilution, his damages calculation amounts to an impermissible windfall.

Although the default judgment establishes as a matter of law that Triller Group breached Section 4.5 of the Merger Agreement, Sarnevesht has not proven damages with reasonable certainty.[72]  His requested remedy is incompatible with the breached covenant, and Biemans's model ignores the effects of dilution that performance would have caused.  I therefore award nominal damages of $1.00.[73]

---

[70] Merger Agreement § 4.5.

[71] *See* Evidentiary Hr'g Tr. 46 (addressing the post-merger stock price).

[72] *See Acierno*, 2005 WL 3111993, at *6.

[73] *See Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC*, 2005 WL 3502054, at *15 (Del. Ch. Dec. 15, 2005) ("Even where actual damages cannot be demonstrated, the breach of a contractual obligation often warrants an allowance of nominal damages." (quoting *Palmer v. Moffat*, 2004 WL 397051, at *4 (Del. Super. Feb. 27, 2004))).

## B. The Registration Covenant Breach

Triller Group also breached the Registration Covenant.[74] Section 4.12 of the Merger Agreement required Triller Group to:

> [p]romptly after Closing . . . prepare and file with the SEC, a Registration Statement on an appropriate form, covering the resale of the Delaware Parent Common Stock into which [CCNs] are converted and the shares of Delaware Parent Common Stock underlying the Delaware Parent RSUs, and shall use commercially reasonable efforts to cause such Registration Statement to be declared effective . . . as promptly as possible after the filing thereof.[75]

Based on the admitted allegations, Triller Group failed to fulfill this obligation, leaving the Triller Group shares held by the former CCN holders unregistered.[76] Before the evidentiary hearing, Sarnevesht asserted that this breach affected over 54 million shares.[77] Biemans since clarified that a reverse stock split reduced the actual number of unregistered CCN shares to 30.4 million.[78]

---

[74] Compl. ¶¶ 19-20, 27; Default J. Hr'g Tr. 6.

[75] Merger Agreement § 4.12.

[76] Compl. ¶¶ 19, 22.

[77] *See id.* ¶ 14; Pl.'s Pre-Hr'g Damages Letter 1, 4.

[78] *See* Evidentiary Hr'g Tr. 35 (Biemans explaining that he used a lower share count of 30.4 million due to a "reverse split after the initial forward split"); *see also* Expert Presentation 21.

## 1.    The Flawed Damages Methodologies

Sarnevesht asserts that stockholders are entitled to recover $4.75 per share—equal to the peak stock price while the shares were unregistered.[79]  Alternatively, he advances his expert's proposed calculation of damages using a "dribble out" VWAP model or a Black-Scholes put option model.[80]  These analyses yield damages estimates ranging from $99.5 million to $256.9 million before deducting the remaining nominal value of the shares.[81]  None of the approaches establish expectation damages with reasonable certainty.

### a.    The New York Rule (Highest Intermediate Price)

To quantify damages for the Registration Covenant breach, Sarnevesht primarily relies on the "New York Rule" as articulated by the Delaware Supreme Court in *Duncan v. TheraTx, Inc.*[82]  In *Duncan*, the court held that when an issuer's breach restricts a stockholder's ability to sell, damages are measured using the highest intermediate price of the shares during a reasonable time after the restriction

---

[79] Pl.'s Pre-Hr'g Damages Letter 4-5; *see also* Expert Presentation 21.

[80] Expert Presentation 19.  The dribble-out approach simulates selling the shares in smaller lots over time using an unaffected volume-weighted average price.  *See* Evidentiary Hr'g Tr. 32-33, 36; *see also* Expert Presentation 19, 22.  The put option approach estimates the cost of hedging the shares against a price decline over a twelve-month period.  *See* Evidentiary Hr'g Tr. 39-40; *see also* Expert Presentation 23.

[81] Pl.'s Pre-Hr'g Damages Letter 4-5; Expert Presentation 21-24.  These estimates are before applying any discount to present value.

[82] 775 A.2d at 1022-24.

began.[83]  This approach serves as an estimate of the price the stockholders would have obtained had they been able to sell, effectively treating the breach as a temporary conversion of the shares.[84]

A plaintiff seeking expectation damages must "show both the existence of damages provable to a reasonable certainty, and that these damages flowed from defendant's violation of the contract."[85]  Sarnevesht has proven the fact of damages—i.e., that Triller Group's breach wrongfully deprived the former CCN holders of the ability to sell their shares.  The resulting uncertainty over when the stockholders would have sold is construed against Triller Group.[86]  But the New York Rule neither overrides the core requirement that damages be proximately caused by the breach nor permits a windfall.[87]

---

[83] *Id.* at 1023.

[84] *Id.* at 1023 n.9.

[85] *See Fletcher Int'l, Ltd. v. Ion Geophysical Corp.*, 2013 WL 6327997, at *17 (Del. Ch. Dec. 4, 2013) (quoting *LaPoint v. AmerisourceBergen Corp.*, 2007 WL 2565709, at *9 (Del. Ch. Sept. 4, 2007), *aff'd*, 956 A.2d 642 (Del. 2008) (TABLE)).

[86] *See Duncan*, 775 A.2d at 1023 (noting that the breaching party bears the risk of uncertainty because its conduct "prevent[s] a court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable" (citation omitted)).

[87] *See Brown v. Matterport, Inc.*, 2024 WL 2745822, at *12, *14 (Del. Ch. May 28, 2024) (noting that contract damages protect expectation interests and must not provide a windfall), *aff'd in part*, *rev'd in part on other grounds*, 340 A.3d 1149 (Del. 2025) (TABLE).

Sarnevesht argues that the former CCN holders are entitled to the peak price Triller Group stock reached while their shares were unregistered. Biemans identified $4.75 per share—the stock's trading price on November 11 and 12, 2024—as the highest intermediate price.[88] He multiplied $4.75 by the 30.4 million unregistered shares held by former CCN holders to reach gross damages of $144.3 million.[89] He then deducted an estimated residual value of approximately $6.1 million (derived from calculating a gross remaining value of $7.5 million for the 30.4 million shares at the stock's $0.25 per share April 2026 trading price, and then applying a 20% put option discount) to arrive at total damages of $138.2 million.[90]

Although *Duncan* resolves the uncertainty of trade timing against Triller Group, expectation damages must still account for trading volume.[91] Injecting millions of shares into a low-volume market signals a sell-off, which depresses the stock price because a discount is often required to attract new buyers.[92] In *Brown v. Matterport, Inc.*, this court explained that calculating damages to address the liquidation of a large block of stock requires a realistic "participation rate."[93]

---

[88] Expert Presentation 21; *see* Pl.'s Post-Hr'g Br. ¶ 26.

[89] *See* Pl.'s Post-Hr'g Br. ¶ 26.

[90] *See id.* ¶¶ 26, 30 (deducting a net $6.1 million residual value from the $144.3 million gross calculation). Values are rounded up.

[91] *Matterport*, 2024 WL 2745822, at *17.

[92] *Id.*

[93] *Id.*

Biemans's primary model assumes that the former noteholders' 30.4 million shares would be liquidated on the two days Triller Group stock hit $4.75 per share.[94] This assumption ignores the reality of market absorption. As Biemans acknowledged, it is economically impossible to liquidate tens of millions of shares without causing the market to crash.[95] Moreover, the average trading volume of Triller Group common stock through November 25, 2024 was roughly one million shares.[96] Liquidating a 30.4 million block in a market absorbing one million shares per day would logically cause the stock price to fall, precluding stockholders from ever realizing the $4.75 peak value.[97]

### b. The VWAP Model

Recognizing the volume constraint with his highest intermediate price analysis, Biemans also offered a "dribble-out" VWAP model.[98] "VWAP is a popular benchmark that accounts for both volume and price to reflect the average price a

---

[94] *See* Expert Presentation 21.

[95] *See* Evidentiary Hr'g Tr. 35.

[96] Expert Presentation 22.

[97] *See Matterport*, 2024 WL 2745822, at *17.

[98] Expert Presentation 22.

19

security trades at throughout the day."[99]  It is a useful metric "when a trader looks to sell a block of shares while minimizing price impact."[100]

Biemans applied a five-week unaffected VWAP from October 17 to November 25, 2024 to simulate selling the 30.4 million shares.[101]  This analysis yielded an average price of $3.47 per share—$1.28 per share lower than the highest intermediate value method.[102]  Multiplying this average price by the 30.4 million unregistered shares yields gross damages of approximately $105 million before deducting the shares' residual value.[103]

Two defects prevent me from adopting this methodology.  First, Biemans ignores the price impact of the stockholders' own trades.[104]  A historical VWAP

---

[99] *Matterport*, 2024 WL 2745822, at *19.

[100] *Id.*

[101] *See* Evidentiary Hr'g Tr. 36.  This simulation attempts to model the standard industry practice of minimizing market impact.  *See Matterport*, 2024 WL 2745822, at *19 n.223 (citing Robert Kissel & Morton Glantz, *Optimal Trading Strategies: Quantitative Approaches for Managing Market Impact and Trading Risk*, 196 (2003) ("[T]raders often attempt to disguise the true size of the order by slicing the order into smaller pieces and executing over a period of time rather than all at once.  The market can usually absorb these smaller slices resulting in reduced market impact cost.")).

[102] The $3.47 average price is calculated by dividing the total dollar value of all shares traded during the five-week window by the total volume of shares traded.  *See* Expert Presentation 22.

[103] *Id.*

[104] *See supra* notes 91-93 (explaining the importance of a realistic participation rate to address trading volume).

20

reflects market prices without a 30.4 million share block sale.[105] Biemans admitted that liquidating such a massive position would depress the stock price.[106] Yet his model lacks a blockage discount to account for this downward pressure.

Second, Biemans's VWAP analysis artificially shields stockholders from Triller Group's financial decline. Biemans acknowledged that 30.4 million shares could not be liquidated in five weeks. Rather, he testified that dribbling out the shares would take up to a year and account for nearly 11% of the total market volume.[107] If the stockholders had sold their massive position over a realistic timeframe, they would have held the majority of their shares when Yorkville demanded collection on November 26, 2024.[108] Biemans's model deliberately cuts off the VWAP window the day before this event, impermissibly removing the negative effects of the company's ensuing collapse.[109]

### c.    The Black-Scholes Put Option Model

Biemans's final analysis relied on a Black-Scholes put option model.[110] A Black-Scholes put option model is a formula used to estimate the option's current

---

[105] *See* Expert Presentation 22 (calculating the VWAP based on unadjusted historical trading data); *see also Matterport*, 2024 WL 2745822, at *17.

[106] *See* Evidentiary Hr'g Tr. 37-38.

[107] *Id.* at 36-37.

[108] Expert Presentation 11, 22.

[109] *Id.* at 22; Evidentiary Hr'g Tr. 37-38.

[110] Expert Presentation 23.

value by calculating what the right to sell an asset at a fixed price is worth based on factors including the asset's current price, the time until the option expires, price volatility, and interest rates.[111] Biemans applied the model as a mathematical proxy to estimate the cost of illiquidity for the unregistered shares. That is, because the stockholders could not sell their shares, Biemans used the put option model to calculate what it would cost to "essentially financially ensure" their ability to sell at a set price over the next 12 months.[112]

Biemans adopted a $4.14 per share price (the closing price just before the Yorkville collection demand was announced) and applied the Black-Scholes formula to calculate the hypothetical cost of protecting that price with a series of options over a 12-month period, yielding an average cost of $0.86 per share.[113] He then deducted $0.86 from the $4.14 stock price, arguing that the "true" value of unregistered shares was $3.28 per share.[114] Multiplied by 30.4 million shares, this calculation generates

---

[111] *See* Robert W. Holthausen & Mark E. Zmijewski, *Corporate Valuation: Theory, Evidence & Practice*, 424-25 (2020); *id.* at 424 ("A put option is an option to sell the underlying security at a certain price for a specified period.").

[112] Evidentiary Hr'g Tr. 39.

[113] Expert Presentation 23; Evidentiary Hr'g Tr. 39-41.

[114] Expert Presentation 24; Evidentiary Hr'g Tr. 41.

22

$99.5 million in damages (before a deduction of $0.25 per share for the stock's residual value, or $7.5 million total for the CCN shares).[115]

Although this approach has conceptual merit, it is flawed in execution because Biemans applied a one-week "lookback" window to measure the stock's volatility.[116] A one-week lookback is not a reliable measure of the stock's expected volatility over the relevant period.[117] Because volatility is a key input in the Black-Scholes formula, using this limited sample undermines the reliability of the resulting option valuation—and, in turn, the damages calculation.[118] This model therefore provides an unreliable measure of expectation damages.

### 2. Damages for Breach of the Registration Covenant

Given that none of Sarnevesht's estimates are reliable, I must fashion a remedy that reflects what the stockholders could have achieved had their shares been registered.[119] To do so, I consider the portion of the 30.4 million shares that the

---

[115] Expert Presentation 24 (calculating the $99.5 million figure); *see also id.* at 26-27; Evidentiary Hr'g Tr. 46 (identifying the $0.25 per share and $7.5 million residual value).

[116] *See* Evidentiary Hr'g Tr. 40; Expert Presentation 23.

[117] *Lillis v. AT&T Corp.*, 2007 WL 2110587, at *21 (Del. Ch. July 20, 2007) (explaining that volatility "is a vitally important measure" in the Black-Scholes formula, and that when "historical volatility is used, the historical period is matched to the remaining time left to exercise the option").

[118] *See* Holthausen & Zmijewski, *supra* note 111, at 424-25 (noting that, all else equal, a call or put option is worth more when written on a stock with a higher variance).

[119] *See Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 176 (Del. 2002) (explaining that "the Court of Chancery has the discretion to award any form of legal and/or equitable relief"); *see also Tex. Instruments Inc. v. Tandy Corp.*, 1992 WL 103772,

stockholders could realistically have sold without depressing the market and before Triller Group's stock price collapsed.[120] Construing the uncertainty against the breaching party, *Duncan* requires that I measure expectation damages by applying the highest intermediate stock price during a reasonable time to the volume of shares the plaintiff was wrongfully prevented from selling.[121]

Data supplied by Biemans establishes the relevant trading window for this calculation.[122] Assuming Triller Group had registered the shares promptly after closing on October 16, 2024, stockholders could have traded during the period leading up to November 25, 2024—the day before Yorkville served for collection and Triller Group's stock price began an unrecovered decline.[123] Biemans's data shows that the daily trading volume during this period averaged

---

at *6 (Del. Ch. May 12, 1992) (explaining that, in "fashion[ing] appropriate relief," the court is not "limited by the relief requested by the plaintiff").

[120] *See Matterport*, 2024 WL 2745822, at *18.

[121] *See Duncan*, 775 A.2d at 1023.

[122] *See* Letter Regarding Excel Files Supporting Slides of Pl.'s Expert (Dkt. 21) (attaching native files of Biemans's analyses) ("Expert Data").

[123] Expert Presentation 11, 22; *see Triller Group Inc. (ILLR)*, Google Finance, https://www.google.com/finance/beta/quote/ILLR:NASDAQ?window=5Y (last visited July 17, 2026) (reflecting a decline in the stock's price beginning on November 26, 2024); *see also Lee v. Pincus*, 2014 WL 6066108, at *4 n.11 (Del. Ch. Nov. 14, 2014) (explaining that the court may take judicial notice of "reported stock prices because they are not subject to reasonable dispute"). I note that Triller Group executed a 1-for-10 reverse stock split in June 2026, which is reflected in the currently available historical trading data. Triller Gp. Inc., Form 8-K (filed June 10, 2026); Triller Gp. Inc., Ex. 99.1 (Shareholder Q&A), Form 8-K (filed June 29, 2026) (describing the reverse stock split).

1,019,883.5 shares.[124]   He did not model a pre-collapse participation rate, but observed that dribbling the shares out over a year would require a 10.9% participation rate.[125]   To resolve the uncertainty of a block-sale execution against Triller Group,[126] I adopt the generous 20% participation rate this court used for a highly motivated seller in *Matterport*.[127]   At this rate, stockholders could have sold 203,976.7 shares per trading day.[128]   There are 28 trading days between October 17 and November 25, 2024.   Multiplied by 203,976.7 shares per day, this calculation yields 5,711,348 shares as the maximum number of shares the plaintiffs were wrongfully prevented from selling before the decline beginning on November 26.[129]

Under *Duncan*, the stockholders are entitled to the $4.75 highest intermediate price for the shares they could have successfully sold during this window, minus the shares' current residual value.[130]   A total of 5,711,348 sellable shares multiplied by

---

[124] Expert Presentation 22; Expert Data, tab 70 (listing Triller Group trading data); *id.* at tab 41 (showing the trading volume for the 28-day window is 28,556,738 shares). 28,556,738 ÷ 28 days = 1,019,883.5 shares.

[125] Expert Presentation 22.

[126] *See Duncan*, 775 A.2d at 1023 (noting the breaching party bears the risk of uncertainty); *SIGA II*, 132 A.3d at 1131 (discussing the "established presumption that doubts about the extent of damages are generally resolved against the breaching party[]").

[127] *See Fletcher Int'l*, 2013 WL 6327997, at *17 (explaining that damages must flow from the breach); *supra* note 85 and accompanying text.

[128] 1,019,883.5 average daily volume x 0.20 participation rate = 203,976.7 shares per day.

[129] 203,976.7 × 28 days = 5,711,348 shares.

[130] *See Duncan*, 775 A.2d at 1023.

$4.75 per share equals a gross $27,128,903.00 starting point.[131] From that total, I must deduct the residual value of the shares since the plaintiffs still possess them.

Because I have rejected Biemans's Black-Scholes analysis, I decline to use his 20% discount to the residual shares.[132] Instead, I adopt his undiscounted estimate of $0.25 per share, which is derived from S&P Capital IQ market data using a volume-weighted average to smooth out daily price fluctuations in this now-thinly traded stock.[133] At this price, the 5,711,348 shares have a residual value of $1,427,837.00.[134] Thus, net damages for the breach of the Registration Covenant are $25,701,066.00.[135]

For the remaining millions of shares that could not have been sold before November 26, 2024, Sarnevesht has not proven an entitlement to expectation damages. He has not shown that the loss in the value of those shares was caused by the breach of the Registration Covenant rather than Triller Group's defaults and

---

[131] 5,711,348 shares × $4.75 = $27,128,903.00.

[132] *See* Pl.'s Post-Hr'g Br. ¶ 30 (calculating residual value by applying a 20% discount to the $0.25 current VWAP); *supra* Section II.B.1.c.

[133] *See* Expert Presentation 26 ("Triller's VWAP for April 2026 is $0.25 with a market cap (per CapIQ) of $47.0 million as of April 30, 2025. Its share price is volatile and it is thinly capitalized."); Pl.'s Post-Hr'g Br. ¶ 30.

[134] 5,711,348 shares × $0.25 = $1,427,837.00.

[135] $27,128,903.00 − $1,427,837.00 = $25,701,066.00.

operational failures.[136]  For those shares, the plaintiffs retain their current residual value.[137]

### C.     Pre- and Post-Judgment Interest

In Delaware, pre- and post-judgment interest is awarded as a matter of right.[138] Such interest compensates a plaintiff for the losses suffered from its inability to use the funds it is awarded.[139]  The Court of Chancery generally looks to the legal rate of interest established in 6 *Del. C.* § 2301 as the benchmark for calculating pre- and post-judgment interest.[140]  That statutory rate is set at 5% over the Federal Reserve discount rate.[141]

Accordingly, I award Sarnevesht pre- and post-judgment interest at the statutory rate, fluctuating with changes to the Federal Reserve discount rate, and compounded quarterly.[142] Compounding the interest quarterly appropriately reflects the financial realities of conducting business and serves the goal of putting injured

---

[136] *See supra* Section I.B.

[137] *See* Pl.'s Post-Hr'g Br. ¶ 30.

[138] *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992); *Moskowitz v. Mayor & Council of Wilm.*, 391 A.2d 209, 210 (Del. 1978).

[139] *Underbrink v. Warrior Energy Servs. Corp.*, 2008 WL 2262316, at *19 (Del. Ch. May 30, 2008).

[140] *See Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988).

[141] 6 *Del. C.* § 2301.

[142] *See* Pl.'s Post-Hr'g Br. ¶ 33 (citing 6 *Del. C.* § 2301(a)).

parties back into the position they would have occupied absent the breach.[143]  This interest will accumulate from October 17, 2024—the approximate date of Triller Group's breach of the Registration Covenant—until the date of payment.[144]

## III.    CONCLUSION

A default judgment is entered in favor of Sarnevesht.  Triller Group breached both the Investment Covenant and the Registration Covenant in the Merger Agreement.  I award nominal damages of $1.00 for the Investment Covenant breach. As for the Registration Covenant breach, Sarnevesht as the representative of former stockholders is awarded damages of $25,701,066.00.  Sarnevesht is directed to submit a proposed form of final order and judgment that applies the fluctuating statutory interest rate, compounded quarterly, to the principal damages award.

---

[143] *See Murphy Marine Servs. of Del., Inc. v. GT USA Wilm., LLC*, 2022 WL 4296495, at \*24 (Del. Ch. Sept. 19, 2022) (explaining that compounding interest better reflects the financial realities of conducting business).

[144] *See Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011) (noting that pre-judgment interest accumulates from the date of the breach). The Merger Agreement required Triller Group to register the shares "promptly" after the October 2024 merger closed.  Merger Agreement § 4.12.  October 17, 2024 is the first day of the "unaffected" post-merger trading window selected by Biemans to measure the damages.  *See* Evidentiary Hr'g Tr. 29-31.  Adopting this date aligns the interest accrual with the damages model and avoids an arbitrary determination of the outer limit of "promptly."